FILED

APR 28 2022

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

1:22CV00406  **RP**

| | |
|---|---|
| RODNEY A. HURDSMAN, on behalf of himself and all others similarly situated, §§§§ | |
| Plaintiffs, §§ | CASE NO._____ |
| v. §§§ | |
| BROCK SMITH, 271st Judicial District Court Judge; GREGORY LOWERY, (former) Wise County District Attorney; and SHARON KELLER, BARBARA HERVEY, KEVIN YEARY, BERT RICHARDSON, and DAVID NEWELL, Texas Court of Criminal Appeals Judges, §§§§§§§§§§ | CLASS ACTION COMPLAINT JURY TRIAL DEMANDED |
| Defendants. §§ | |

VERIFIED CLASS ACTION CIVIL RIGHTS COMPLAINT
SEEKING DECLARATORY RELIEF

I. INTRODUCTION

1.   This is a 42 U.S.C. § 1983 Class Action Civil Rights Complaint brought by Rodney A. Hurdsman ("Hurdsman"), a state prisoner, on behalf of himself and all others similarly situated, now, and in the future, seeking declaratory relief against the Defendants for violating the Plaintiffs Fifth and Fourteenth Amendment rights to the United States Constitution.

2.   Specifically, Hurdsman seeks a declaration from this Court pursuant to 28 U.S.C. §§ 2201-2202, against the Defendants, declaring that:

   a.   The acts and ommissions of former Wise County District Attorney Gregory Lowery ("Lowery"), and 271st Judicial District Court Judge Brock Smith ("Smith"), concerning Hurdsman's Texas Code of Criminal Procedure ("CCP") Article 11.07 Writ of Habeas Corpus Application ("11.07 Application") violated his Fifth and Fourteenth Amendment rights;

b.  the acts and ommissions of Lowery and Mr. Smith concerning Hurdsman's CCP 11.07 application violated Article I, §§ 3, 3(a) and 19, of the Texas State Constitution, and his right to Equal Rights and Equality under the law, and Due Course of the Law;

c.  CCP Article 11.07, §§ 3(b), (c) and (d), are unconstitutional as written, and incorporate arbitrary, ambiguous, overbroad and vague non-mandatory language and clauses, that conflict with mandatory (shall) language drafted into the body of the articles sections by its authors, and invite arbitrary and unequal treatment of an individuals 11.07 application by state judiciary officials, which allows them to discriminate against an individual based upon race, societal standing in the community, and financial means to be represented by an attorney which almost always results in preferential and special treatment because of cronyism within the judicial system and courts;

d.  the acts and ommissions of Texas Court of Criminal Appeal ("TCCA") Judges Sharon Keller, Barbara Hervey, Kevin Yeary, Bert Richardson and David Newell (collectively "TCCA Judges") concerning Hurdsman's CCP 11.07 application violated his Fifth and Fourteenth Amendment rights;

e.  the current Standing Internal Operating Procedures ("SIOP") dupliciously promulgated and implemented by the TCCA Judges, which require a TCCA staff attorney or member to make a pre-functionary review of all CCP 11.07 applications submitted to the Court, and decide themselves if those applications should be summarily denied, and then assignes those 11.07 applications to a single judge of the TCCA whom then follows through with that recommended disposition denying those applications without consulting or convening a quorum of TCCA judges, as mandated by Article V, § 4 of the Texas State Constitution, violates Aticles I, §§ 3, 3(a) and (d), and Article V, § 4, of the Texas State Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution.

3.  The Plaintiffs further seek any attorney fees and associated costs incurred encountered in this suit.

## II. JURISDICTION

4.  This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), and the Fifth and Fourteenth Amendments of the United States Constitution.

5.   Supplemental jurisdiction of this Court is also invoked over any Texas Constitutional and State Court claims pursuant to 28 U.S.C. § 1637, and over any claims against the Defendants for violations of common-law pursuant to 28 U.S.C. § 1367, as those claims form the same case or controversy.

## III. VENUE

6.   The United States District Court, for the Western District of Texas, Austin Division, is the appropriate venue for this lawsuit pursuant to 28 U.S.C. § 1391(b), as it is where some of the events that have given rise to the claims herein occurred, and are still presently ongoing.

## IV. PARTIES

PLAINTIFFS:

7.   Plaintiff: Rodney A. Hurdsman is a citizen of the United States of America, and a resident of the State of Texas, he is currently confined in the Texas Department of Criminal Justice, Institutional Division, at the Robertson Unit located at 12071 F.M. 3522, Abilene, Texas 79601.

8.   Potential Plaintiffs: Potential Plaintiffs are all other people whom have filed a CCP 11.07 application attacking an unconstitutional conviction or sentence in any of the 254-Counties in the State of Texas, and have had their applications processed and denied in the same or similar unlawful manner as Hurdsman's.

DEFENDANTS:

9.   Defendant: Brock Smith is the current Judge of the 271st Judicial District Court in Wise County Texas, located at 101 N. Trinity Street,

Decatur, Texas 76234. His current mailing address is P.O. Box 805, Decatur, Texas 76234, and his phone number is (940) 627-3200.

10. Defendant: Gregory Lowery is the former Wise County District Attorney, however, he is currently a county judge in Wise County. His current mailing address is P.O. Box 901, Decatur, Texas 76234, and his phone number is (940) 627-5005.

11. Defendants: Sharon Keller, Barbara Hervey, Kevin Yeary, David Newell and Bert Richardson, are all current judges of the Texas Court of Criminal Appeals located in Austin, Texas. Their current mailing address is Supreme Court Building, 201 W. 14th Street, Austin, Texas 78701-1445.

12. At times relevant to the allegations contained within this Complaint the aforesaid Defendants were acting within the nature and scope of their official duties, as members of either the Wise County District Attorney's Office, the 271st Judicial District Court or Texas Court of Criminal Appeals and the State of Texas.

13. At other times relevant to the allegations contained within this Complaint the aforesaid Defendants were acting in their individual capacities, seperate from their state duties.

14. At all times relevant to the allegations contained within this Complaint the Defendants were each acting under the color of state law, regulations, customs and policies, as members of either the Wise County District Attorney's Office, the 271st Judicial District Court or the Texas Court of Criminal Appeals and the State of Texas.

15. At all times relevant to the claims and allegations within this Complaint the State of Texas was the employer and principal of each

Defendants, and the County of Wise, Texas was the also the employer and principal of Judge Brock Smith and former District Attorney ("D.A.") Gregory Lowery.

## V. CLASS ACTION CERTIFICATION

16.   The Plaintiffs respectfully request that this Court reserve their right to seek class certification pursuant to Rule 23, Fed. R. Civ. P., at a later date, and upon proper motion and brief by an attorney representing the Plaintiffs in the future. Plaintiffs fully expect and anticipate many similarly situated non-parties to this suit to intervene as the case develops, and based upon that number of individuals class certification will be properly requested.

## VI. DEMAND FOR A JURY TRIAL

17.   The Plaintiffs invoke their right to a trial by jury in this case pursuant to Rule 23, Fed. R. Civ. P., and the United States Contitution and its Amendments.

## VII. FACT COMMON TO ALL COUNTS
### (In Chronological Order)

18.   On September 14, 2017, Hurdsman was unlawfully convicted in the 271st Judicial District Court (the "trial court") of Wise County Texas for theft of property, a third degree felony, and he was then sentenced to an astounding 75-year prison sentence.

19.   On November 8, 2018, his direct appeal to the intermediate appellate court was denied, and his conviction was affirmed by the Second Court of Appeals.

20.   The TCCA then refused his Petition for Discretionary Review of his direct appeal on March 20, 2019.

21. That concluded the direct appeal process in Hurdsman's case, which was solely designed for the purpose of reviewing error that was properly preserved by objection in the trial court, and is based solely, on a review of the trial court record made.

22. In contrast, constitutional fundamental or structural errors, and the damaging effect that they may sometimes have on the outcome of the trial proceedings, are not always readily apparent from the record, and on principals of fundamental fairness, need to be further developed through a full and fair fact finding procedure, which was the situation Hurdsman found himself in after exhausting his direct appeal avenues fully.

23. As a result, Hurdsman sought State post-conviction remedies, and filed a CCP 11.07 application on January 20, 2020.

24. In accordance with Article 11.07, § 3(b):

  a. Hurdsman filed his application with the Clerk of the trial court who then assigned the application to Judge Smith's court;

  b. when Hurdsman's application was recieved by Judge Smith a Writ of Habeas Corpus was issued by operation of law;

  c. the Clerk of the Court then made appropriate notation thereof, assigned the case a file number, and forwarded a copy of the application to the attorney representing the State in that court, who "shall answer" the application not later than the 15th day after recieving the application.

25. Mr. Lowery was the attorney representing the State at that time, and he recieved a copy of Hurdsman's application from the Clerk of the Court, and was then required by the mandatory language (shall) of § 3(b) to "answer" Hurdsman's application "not later than the 15th day after recieving" it; however, Mr. Lowery failed to "answer" it and in fact, he has never had to or been made to "answer" the application.

26.  Lowery capriciously decided that he was not required to "answer" Hurdsman's 11.07 application, presumably relying on an arbitrary default clause written into the last sentence of § 3(b), which has been used by some, but not all, District Attorneys in the State as a loop-hole or escape mechanism to avoid having to "answer" 11.07 applications, and address pertinate fact issues 11.07 applicant's have asserted to support their claims and the legality of their confinement.

27.  However, the presumed default or escape clause found in the very last sentence of § 3(b) does not state that the attorneys representing the State do not have to "answer" 11.07 application within the 15-day prescribed period, it states, "[m]atters alleged in the application 'not admitted' by the state are deemed denied." No where in § 3(b) does it state that the attorneys representing the State are "not required to answer" the application after recieving them, that is a faulty presumption, and one that was made by Lowery when he failed to "answer" Hurdsman's application.

28.  The sentence preceding the presumed default or escape clause of § 3(b), use basic cannons of statutory construction which use the word "shall" indicating the legislative authors intent that the pre-vision be mandatory; therefore, that mandatory language requires that attorneys representing the State, such as Lowery, "shall" "answer" 11.07 applications within 15-days of recieving them.

29.  The default or escape clause found in the last sentence of §3(b) is arbitrary, capricious, amiguous and overbroad, and has allowed attorneys representing the State within the 254 different counties

7.

of the State of Texas to pick and choose which applicant's 11.07 applications they want to "answer" and which ones they do not, which has resulted in disparitive and unequal treatment of any number of individuals applications being unlawfully processed, and has also permitted improper biases, antipathy and prejudices to be incorporated into their partial decisions not to "answer" an individuals 11.07 application.

30.  This has resulted in some State attorneys within each of the 254 counties of the State to follow the mandatory language within § 3(b), and "answer" all 11.07 applications within the 15-day time period prescribed by law, while other just simply ignore the 11.07 applications they recieve and do nothing within the 15-day time period.

31.  On information and belief, the majority of 11.07 applications that are properly "answered" by State attorneys, are those in which an individual is represented by an attorney, and in counties with large and diverse ethnic populations and, large judicial systems and financial resources that employ whole departments to respond to an applicants 11.07 application.

32.  While the majority of 11.07 applications filed by individuals pro se, and in rural counties with less diverse ethnic populations and, small judicial systems and financial budgets that do not employ specialized departments to respond to an applicants 11.07 applications, are almost never "answered" by attorneys that represent the State.

33.  When State attorneys choose to ignore the mandatory language of § 3(b) and not "answer" an applicant's 11.07 application, as Lowery did in Hurdsman's case, fundamental principals of fairness are

encroached and violated, such as both substantive and procedural due process and equal protection of the law.

34. Nevertheless, after Lowery failed to "answer" Hurdsman's 11.07 application within the prescribed 15-day period the next paragraph of § 3 became operational.

35  In accordance with Articl 11.07, § 3(c):

  a.  Within 20-days of the expiration of the time in which the
      state is allowed to answer, it "shall be the duty" of the
      convicting court to decide whether there are controverted,
      previously unresolved facts material to the legality of
      the applicant's confinement;

  b.  if the convicting court decides that there are no such
      issues, the clerk "shall" immediately trasmit to the Court
      of Criminal Appeals a copy of the application, any answers
      filed, and a certificate reciting the date upon which that
      finding was made.

36. Hurdsman's Article 11.07 application was verfied under the penalty of perjury, and raised a total of six (6) constitutional claims for relief, which he supported with attached evidentiary exhibits.

37. Hurdsman also properly filed multiple motions requesting to be given a full and fair opportunity to expand and develop the record through subpoenas duces tecum and ad testificandum, and a hearing to elicit testimony relevant and material to prove his claims; as there were numerous controverted, previously unresolved fact issues material to the legality of his confinement, which needed to be further developed and vetted.

38. For purposes of this Complaint, Hurdsman proffers one such fact issue that needed to be properly developed, resolved and vetted, although there were several others relevant and material to each of

9.

his individual claims, in order to demonstrate and expound upon the
very real disparitive treatment he encountered, and fundamentally
unfair procedural process he recieved by the trial court judge, Brock
Smith, as follows:

    a. Immediately following an August 13, 2014 court appearance
       Hurdsman's attorney Raymond S. Napolitan III ("Napolitan")
       met with Mr. Lowery in his office and negotiated an 18-month
       Plea-bargain in the case;

    b. on that same date, Napolitan communicated that 18-month plea
       offer to Hurdsman in front of witnesses, which Hurdsman
       accepted at that time;

    c. Napolitan further communicated to Hurdsman that he would
       inform Lowery of his decision, and set-up a plea hearing in
       the case. so that he could enter into the terms of that plea
       offer before the court;

    d. however, not only did Napolitan not follow through with any
       of that of which he said, but he also surreptitiously with-
       drew from the case 24-days later, on October 7, 2014, with-
       out ever, notifying Hurdsman and without his presence in
       court;

    e. which effectively left Hurdsman without an attorney in the
       case thereafter, for a period of 33-months during the crit-
       ical pretrial stage of the proceedings.

39. In support of this factual predicate, Hurdsman properly attached
as Exhibits to his 11.07 application, the following evidence:

    a. Transcripts from a September 11, 2017 pretrial hearing, in
       which a 30-year trial attorney and Officer of the Court,
       whom is presently a Wise County Assistant District Attorney
       "represented" to the Court on the record that there had been
       an 18-month plea-bargain offer in the case back in 2014, by
       the state, which Hurdsman intended to accept (in contrast,
       Napoltan was a junior associate attorney of a small (2-man)
       law firm 2-years out of college in 2014);

    b. Transcripts from an August 17, 2017 pretrial hearing, in
       which Hurdsman himself explained to the Court on the record
       that Napolitan negotiated, communicated and he had accepted
       an 18-month offer in the case in 2014 (it is noteworthy,
       that in both instances in which Hurdsman and the aforesaid
       attorney placed the fact that there had been an 18-month
       offer by the state in 2014, the attorney representing the
       state at those hearings sat-mute and did not and was not
       made to confirm or deny that they had made the offer back
       back in 2014, and when, if and why it was withdrawn;

   c.  three sworn affidavits, two of which were from individuals other than Hurdsman that did not possess criminal records, attesting to the fact that Napolitan negotiated the 18-month plea-bargain and communicated it to Hurdsman, who accepted it, and to his unethical and surreptitious withdrawl from Hurdsman's case in 2014, without notifying him or his presence in court.

40.  As has been previously shown, Mr. Lowery completely failed to adhere to the mandatory language drafted into § 3(b) by its authors, and he entirely disregarded Hurdsman's 11.07 application and failed to respond and "answer" the simply question of whether he had made the 18-month plea offer to Hurdsman through Napolitan in 2014. That fact alone, by itself, created a controverted, previously unresolved fact issue material to the legality of Hurdsman's confinement and needed to be further developed.

41.  However, the trial court judge, Brock Smith, failed to perform his "duty," as set-out in Article 11.07 § 3(c), and took no-action in regards to the aforesaid controverted, previously unresolved fact issue that needed further development (and many others) in Hurdsman's case, and concerning Hurdsman's 11.07 application as a whole.

42.  It is presumed, that Judge Smith was able to shirk his "duty" to determine if there was any controverted, previously unresolved facts material to the legality of Hurdsman's confinement raised in his 11.07 application, pursuant to default or escape clause found in the last sentence of § 3(c); which states, "[f]ailure of the court to act within the allowed 20 days shall constitute such a finding."

43.  The aforesaid default or escape clause found in in last sentence of § 3(c) is unconstitutionally arbitrary, ambiguous, overbroad, vague, uncertain and indefinate on its face, and invites arbitrary, unequal and discriminatory treatment of different 11.07 applicants.

44. CCP Article 11.07, § 3(d), specifically states:

    a. If the convicting court decides that there are controverted, previously unresolved facts which are material to the legality of the applicant's confinement, it shall enter an order within 20 days of the expiration of time allowed for the state to reply, designating the issues of fact to be resolved;

    b. to resolve those issues the court may order affidavits, depositions, interrogatories, additional forensic testing, and hearings, as well as using personal recollection.

45. Judge Smith capriciously decided that he did not have a "duty" to determine whether or not there were controverted, previously unresolved facts material to the legality of Hurdsman's confinement, presumably relying on the default or escape clause written into the last sentence of § 3(c), which has been used by some judges, but not all, as a loop-hole or escape mechanism to avoid having to decide if there are any controverted, previously unresolve facts material to the legality of an applicant's confinement, and to not have to deal with the 11.07 applications that come before them.

46. However, the presumed default or escape clause found in the very last sentence of § 3(c) does not state that judges are allowed to shirk their "duty" to decide if there are any controverted, previously unresolved facts material to an applicant's confinement, it states, "[f]ailure of the court to act within the allowed 20 days shall constitute such a finding [that there are no controverted, previously unresolved facts material to the applicant's confinement].

47. The very first sentence of § 3(c), uses basic cannons of statutory construction which use the word "shall" indicating the legislative authors intent that the prevision be mandatory; therefore, the mandatory language requires that judges, like Brock Smith, have a

mandatory "duty" "to decide whether there are controverted, previously unresolved facts material to an applicant's confinement;" and if there is, they have a further mandatory "duty" pursuant to § 3(d), to "enter an order, designating the issues of fact to be resolved."

48.  § 3(c) and (d), of CCP Article 11.07, conflict with one another, and are unconstitutionally arbitrary, ambiguous, overbroad, uncertain, vague and indefinate in relation to one another, inviting and creating arbitrary, unequal and discriminatory treatment of individuals and their 11.07 applications.

49.  The two (2) default escape clause loopholes found in the last sentences of both § 3(b) and (c) have further invited arbitrary and unwarranted presumptions to made by several courts, which clearly conflict with the mandatory Language (shall) and terms of § 3(b), (c) and (d).

50.  See Bibbs v. Hollub, et al., 2013 U.S. dist. LEXIS 32872 *15-16 (W.D. Tex. S.A. Div. March 8, 2013, Case No. SA-11-CA-671-XR) ("also included in the default language that if thereis no action taken by the attorney representing the state, such inaction leads to a presumption in favor of the state," and "[s]imilarly, if the convicting court fails to take action in deciding whether there are controverted, previously unresolved facts, such a failure also leads to a presumption in favor of the state."

51.  There is no presumption or intent of one written into § 3(b) and (c) by the legislative authors, which would permit a presumption to be made "in favor of the state" when the attorney representing the state fails to "answer" an application or when a trial court fails their "duty" to decide whether there are controverted unresolved facts.

52. In any event, in accordance with Article 11.07 § 3(c), after the 20 day prescribed time period expired, the claek of the court transmitted a copy of Hurdsman's 11.07 application to the TCCA; with no "answer" filed by the state and no fact findings from the trial court.

53. As such, Hurdsman was constructively, systematically and completely denied any means or opportunity to fully and fairly develop the factual record to support his constitutional claims, and the numerous requests (motions, subpoenas ect.) he properly filed to be allowed to do so were disregarded and ignored, as was the substantial evidence he proffered attached to his 11.07 application which established many controverted, previously unresolved fact issues material to the legality of his confinement.

54. Article 11.07 § 5 states, [t]he Court of Criminal Appeals may deny relief upon the findings and conclusions of the hearing judge without docketing the cause, or may direct that the cause be docketed and heard as though originally presented to said court or as an appeal."

55. However, when the TCCA recieved Hurdsman's 11.07 application from the trial court they, took neither of the aforesaid action in his case and, although they should have docketed the case and heard it as though it was originally presented to the Court because there were zero findings and conclusions made by Judge Smith, they instead, simply remanded Hurdsman's application back to the trial court and ordered Judge Smith to resolve the controverted, previously unresolved facts material to Hurdsman's confinement that he had failed to during the initial trial court proceedings.

56. When the TCCA remanded Hurdsman's 11.07 application back to Judge Smith's court with instructions to resolve all controverted, previously unresolved facts material to the legality of Hurdsman's confinement, Judge Smith was required, in accordance with Article 11.07 § 3(d), to enter an order designating the issues of fact to be resolved, and to resolve those issues by ordering affidavits, depositions, interrogatories, additional forensic testing, and hearings.

57. And, in accordance with Article 11.07, § 7:

    a. When... the [trial] court issues an order relating to an application for a writ of habeas corpus, the clerk of the court shall mail or deliver to the applicant a copy of the... order.

58. However, Judge Smith did not issue any proper orders; instead, he reached-out and solicited an affidavit from attorney Raymond S. Napolitan through an unlawful ex-parte communication without any type of order notifying Hurdsman he had done so.

59. Such ex-parte communications are explicitly prohibited by the Texas Code of Judicial Conduct, and Cannon 3(b)(8), which admonishes: "A judge shall not initiate, permit, or consider ex-parte communications, or other communications made to the judge, outside the presence of the paties...."

60. On information and belief, Judge Smith and Napolitan improperly discussed Napolitan's representation of Hurdsman in 2014, and issues concerning the 18-month plea-bargain Napolitan negotiated and then communicated to Hurdsman that existed in the record and, Napolitan's capricious withdrawl from Hurdsman's case in October of 2014, which left him without an attorney in the case for 33-months, thereafter.

61. In any event, shortly after the prohibited ex-parte communication between Judge Smith and Napolitan, Napolitan submitted an affidavit to the court in which he purjured himself concerning his representation of Hurdsman in 2014, in doing so Napolitan:

    a. Denied that he ever negotiated an 18-month plea-bargain with the state in Hurdsman's case;

    b. nor did he ever communicate any such offer to Hurdsman;

    c. that the state had never offered any plea-bargain in the case, and that he would have communicated any offers he negotiated or recieved to Hurdsman, and

    d. after he withdrew from the case, he and other people at the law firm continued to help Hurdsman and assist him in the case.

62. However, there existed in the trial court record clear and convincing evidence that there in fact had been an 18-month offer negotiated, communicated and accepted in the case in 2014, and there was zero evidence in the record that Napolitan, or any one else from the law firm, did anything to help or assist Hurdsman in the case after Napolitan had withdrawn in 2014.

63. Confronted with Napolitan's perjured affidavit, Hurdsman then proffered to Judge Smith extrinsic evidence disproving Napolitan's affidavit:

    a. On July 16, 2020, Hurdsman proffered to the Court, via the district clerk, a thumb-drive containing an audio-recorded conversation between Napolitan and Hurdsman of a June 3, 2015, jail telephone call Hurdsman made while confined at the Williamson County jail, in which Napolitan acknowledge (out of his own mouth) the existence of the 18-month plea-bargain he said in his affidavit did not exist;

    b. along with the thumb-drive of the recorded conversation, Hurdsman proffered a written memorandum describing the substance of the recording and an affidavit averring to its authenticity, and the assertions contained within were sufficient to authenticate it under Tex.R.Evid. 901(a).

16.

64. However, Judge Smith relied explicitly on Napolitan's affid-
avit, and his denial of the existence of the 18-month plea-offer,
to make his fact findings without even addressing the implications
of the audio recorded conversation, and the substantial evidence
which already existed on the record belying Napolitan's assertion
that an 18-month offer ever existed.

65. In fact, there in nothing in the record to indicate that the
Judge even listened to the evidence or considered the substantial
amount of other evidence that was part of the record clerly belying
Napolitan's affidavit and false assertions.

66. More troubling, is the inexplicable fact, that the thumb-
drive containing the audio recorded conversation suspiciously went
missing from the trial court habeas record, and that the trial
court failed to make that evidence part of the state habeas record
and forward it to the TCCA in Hurdsman's case.

67. Nevertheless, again Judge Smith failed to perform his "duty"
as set-out in Article 11.07 § 3(c), to fully and fairly resolve the
controverted, previously unresolved facts material to the legality
of Hurdsman's confinement, and entirely denied Hurdsman any oppor-
tunity to expand or develop the record further through subpoenaes,
interrogatories (Mr. Lowery to this day has not had to or been made
to answer the simple question of whether he made the 18-month offer)
and hearings, in order to elicit testimony and obtain evidince to
support the constitutional claims within his 11.07 application.

68. Throughout the 11.07 application process, Judge Smith has not
ever even ackowledged, mentioned or considered Hurdsman's numerous
motions and requests to expand and develop the record with material

and relevant evidence to support his constitutional claims, and he has disregarded, wholesale, Hurdsman's evidence contradicting Napolitan's affidavit and supporting his claims.

69. On information and belief, Judge Smith has put-up-a-wall, and purposefully and intentionally denied Hurdsman all access to the courts, and the 11.07 application and discovery process and procedures, because of Hurdsman's predominantly hispanic heritage and race.

70. On information and belief, Judge Smith holds and possesses a discriminatory hatred, bias and enmity against individuals such as Hurdsman of hispanic heritage and race, and that his bigotry is a well-known fact and been on display to the citizens of Wise County in and around the Wise County Courthouse.

71. This assertion is not made lightly, and is supported by the fact that on July 16, 2020, when Hurdsman's family members (whom have never been convicted of a crime, period, in their lives) went to the Wise County Courthouse and filed Hurdsman's affidavit, memorandum and the thumb-drive containing the audio recorded conversation between Napolitan and Hurdsman in which Napolitan acknowledged the existence of the 18-month offer, the clerk of the court (or the deputy clerk) stated, "I'll go ahead and file it, but the judge isn't even going to listen to it if it came from Hurdsman, 'the judge doesn't care much for Mexicans.'"

72. On information and belief, similarly situated non-hispanic "white" individuals were granted and given greater access to the court, and to a full and fair fact finding process in order to fully develop and expand the record to support their applications,

motions, pleadings and petitions, by Judge Smith and in his court; while Hurdsman was not becasue of Judge Smith's discrimination and bigotry against him based on his hispanic heritage and race.

73. Nevertheless, Hurdsman's 11.07 application was then again fowarded to the TCCA a second time by the clerk of the trial court, however:

    a.  There was nothing more added or contained within the habeas trial court record other than Napolitan's affidavit and Judge Smith's fact findings (which was basically just a verbatim recitation of Napolitan's false assertions contained within his affidavit), but;

    b.  there was critical, relevant and material evidence also entirely missing from the habeas trial court record (the thumb-drive containing the audio recorded conversation between Napolitan and Hurdsman in which Napolitan admits there had been an 18-month offer (out of his own mouth) in the case in 2014).

74. Hurdsman then, inexplicably, recieved a one-sentence 4" x 6" (26-cent) post-card from the TCCA dated October 7, 2020, advising him that, "the Court has denied without writen order the application for writ of habeas corpus on the findings of the trial court without a hearing, and on the Court's independent review of the record." See Ex parte Hurdsman, WR-89-899-06 (Tex. Crim. App. Oct. 7, 2020.

75. However, a required quorum of TCCA judges did not make the determination to deny Hurdsman's 11.07 application, nor did a required quorum of TCCA judges conduct an independent review of the record in Hurdsman's case, as was constitutionally required by the mandatory language, and plain terms, of Article V, § 4 of the Texas State Constitution.

76. Pursuant to an unlawfully promulgated and implemented internal TCCA court procedure, after the clerk of the trial court forwarded

the habeas record in Hurdsman's case to the TCCA, his application was prefunctionarily reviewed by a non-judicial employee or staff member of the Court.

77.   That staff member or employee then summarily made a determination that Hurdsman's application should be denied without a written opinion and then assigned the case to a single judge of the TCCA whom, simply signed-off on that staff member or employees recommendation without consulting or convening a quorum of the Court, which was constitutionally required by Article V, §4 of the Texas State Constitution.

78.   The "post-card" denial of Hurdsman's 11.07 application was then issued, presumably, by some type of proxy-vote of the Court, pursuant to the unlawful internal-procedure allowing such arbitrary and capricious action to be made by a non-judicial staff member or employee of the Court and without the required quorum of TCCA judges.

79.   Hurdsman was denied substantive and procedural due process and equal protection of the laws throughout the entirety of the 11.07 application process, and by the TCCA's internal-procedure which was used to dispose of his case, because:

   a.   Critical evidence properly filed with the trial court was surreptitiously missing from the habeas record (the thumb-drive containing the audio recorded jail call between Napolitan and Hurdsman;

   b.   the substantial clear and convincing evidence on the record which Judge Smith and the TCCA disregarded, ignored and never address in any manner throughout the proceedings disproving Napolitan's affidavit;

   c.   Mr. Lowery, the former Wise County District Attorney has never been made to answer the simple question of whether he made the 18-month offer (should have been done first);

d. Hurdsman was given zero opportunity to develop and expand the record, and every motion and pleading he filed requesting to be allowed to do so was disregarded and ignored;

e. the trial court judge further did not even address two of Hurdsman's constitutional claims in his fact findings and did nothing more but really recite verbatim the false assertions made by Napolitan in his perjured affidavit.

80. Presumably, no group of three judges (quorum) from the highest criminal court in the State of Texas would allow such a sham process and procedure to stand without intervening to correct it, and then allow a staff member or employee of the Court to make the ultimate determination to deny Hurdsman's 11.07 application, and put their stamp on it. The named TCCA Defendant Judges did and do it in every case that passes through their Court.

81  Section Four of Article V of the Texas Constitution governs the manner in which the Court of Criminal Appeals must convene to decide its cases, and it permits the Court in non-death penalty cases to sit in panels of three or en banc.

82. Section Four (b) of Article V of the Texas State Constitution, specifically states:

> (b). For the purpose of hearing cases, the Court of Criminal Appeals may sit in panels of three judges, the designation thereof to be under the rules established by the Court. In a panel of three judges, two judges "shall" constitute a quorum and the concurrence of two judges "shall" be necessary for a decision... When convening en banc, five judges "shall" sonstitute a quorum and the concurrence of five judges "shall"be necessary for a decision.

83. Thus, under its plain terms, the Texas Constitution sets forth two ways that the Court may decide its non-death penaly cases:

a. First, the Court mat sit in panels of three judges under rules established by the Court, and that requires two judges for a quorum and decisions;

b.  second, alternatively, the Court may be convened en banc by the Presiding Judge under the rules established by the Court, and that requires five judges for a quorum and decision.

84.  Therefore, the Texas State Constitution mandates that a quorum of judges decide the Court's non-capitol cases, and the Court's internal administrative procedure that effectively operates as a standing order to permit a single judge to deny habeas relief in certain catagories of 11.07 applications, such as Hurdsman's, based on a predetermined proxy vote in the absence of actual consideration of each case by a quorum fails to comply with the Texas Constitution and the Texas Code of Criminal Procedure.

85.  The practice of denying habeas relief by the vote of a single judge (or their staff) of the Court conflicts with the plain terms of Article V, § 4 of the Texas Constitution, and Article 11.07 of the Texas Code of Criminal Procedure, which together require that a quorum of the TCCA judges decide these cases.

86.  The TCCA's internal administrative procedure unconstitutionally allows a single judge (really a staff member) to have exclusive control over the disposition of an Article 11.07 application, that has been randomly assigned to them for resolution by their sole vote.

86.  The vote of a single judge cannot serve as a valid proxy for the vote of a quorum of judges that is required by the Constitution of the State of Texas for the decision of the TCCA.

87.  The plain language in the CCP requires that, in the absence of findings and conclusions from a habeas judge that the Court deems adequate to justify the denial of relief, Article 11.07 applications must be handled like direct appeals or petitions for discretionary

22.

review, which requires a panel of three judges or five judges of the en banc Court (a quorum).

88.  However, even when the trial court judge has made findings of fact and conclusions of law, a quorum is required because the statute refers to a decision by the Court rather than by individuals of the Court, and a single judge's ruling (on a non-judiciary staff members recomendation) to deny habeas relief does not satisfy the requirement that that decision be made by two judges of three judge panel or by five judges of the en banc Court.

89.  And, because some TCCA judges other than the named Defendant judges do submit cases to a quorum, while the others do not, all 11.07 applications for habeas relief are not treated equally under the TCCA's current system, which violates due process and equal protection of law.

90.  Thousands of 11.07 applicants each year, in an identical procedural posture as Hurdsman, are also being denied relief in a manner that is unauthorized by the Texas Constitution, and statutes, based on the decision of certain individual judges who, acting alone, deny relief on those cases, and are named as Defendants in this case.

91.  On information and belief, the aforesaid unconstitutional TCCA internal administrative procedures have been in full effect and used by the Defendant TCCA judges, and the majority of the Court from at least as far back as 2016, and up to the present and ongoing date of the filing of this Complaint.

92.  This information and belief is further supported by the fact that, former TCCA court judge, the Honorable Elsa R. Alcala, fully exposed the named TCCA Defendants, and their unlawfully promulgated internal

administrative procedure, and the Defendants implementation and use of the procedure, as layed-out in this Complaint, in the Judge's Concurring Opinion in Ex Parte Dawson, 502 S.W. 3d 294 (Tex.Crim.App. November 23, 2016).

93. In that Concurring Opinion, the Honorable Judge Elsa R. Alcala, stated:

> "The individual judges on this Court [TCCA] who are resolving habeas applications without a quorum of a panel of judges or a decision by the en banc Court are doing so in the absence of any constitutional or statutory authority. And, their individual decisions are depriving myself and the rest of the judges not assigned to a given case of our rights under the Texas Constitution to meaningfully participate in these decisions either as a member of a panel of judges assigned to these cases or as part of the en banc Court."

94. The TCCA judges named as Defendants in this suit, have not only admitted to the promulgated, implementated and use of the unconstitutional internal administrative procedure, but have condoned its use to arbitrarily, capriciously and discriminatorily dispose of thousands of individuals 11.07 applications, by a decision of a non-judicial staff member and single judge, each year for some time. See generally, Ex Parte Dawson, 502 S.W. 3d 294, Tex.Crim.App. 2016) (Concurring Opinion Keasler, J., in which Keller, Hervey, Richardson, Yeary and Newell joined); Ex Parte Coronado, 508 S.W 3d 261 (Tex.Crim.App. 2016) (same); Ex Parte Bernal, 508 S.W. 3d 272 (Tex.Crim.App. 2016) (same); Ex Parte Penn, 508 S.W. 3d 293 (Tex.Crim.App. 2016) (same); and Ex Parte Ben, 508 S.W. 3d 298 (Tex.Crim.App. 2016) (same).

95. Each year thousands of people, such as Hurdsman, file 11.07 writ of habeas corpus applications in one of the 254-counties, and 507-different judicial district courts in the State challenging the legality of their confinement and have their properly submitted 11.07

applications processed and dealt with in the same or in a similar procedural manner as was Hurdsman's.

96.   These are applications in which the majority of the time the attorney representing the State in one of the 254 counties in Texas has failed to follow the mandates of 11.07 § 3(b) and "answer" the applicant's claims; and in which the trial court judge in one of the 507 different judicial district courts have shirked their "duty" to provide an applicant a full and fair opportunity to further develop and expand the record to support their claims and to properly resolve all controverted, previously unresolved facts material to the legality of that applicant's claims as mandated by 11.07 § 3(c)-(d).

97.   Furthermore, these are applications in which the majority of the time they are denied because a TCCA staff member or employee has unlawfully decided that the applicant's claims have no merit, and then has made that recommendation to a single judge that the case is assigned to who, simply rubber-stamps that decision without the mandated quorum of the Court pursuant to Article V, § 4 of the Texas State Constitution.

98.   In Dawson, the Honorable Elsa R. Alcala, stated that in 2015 the TCCA disposed of 9,823 cases, and that 4,429 of them were habeas applications in non-death penalty cases; and that after doing the math "this means that, assuming that each judge was involved and voted on every case, each judge on [the] court had about twelve [12] minutes to spend on each case. No one can seriously believe that this is an adequate amount of time to resolve these cases." Dawson, at 306.

99.   The habeas record in Hurdsman's case was close to 4,000 pages, and the TCCA claimed to have denied his application on the findings

of the trial court without a hearing, and on "the Court's independent review of the record."

100. Indeed, taking the Honorable Elsa R. Alcala's statement as fact; a TCCA staff member or employee and a single judge of the Court, incredibly, conducted and completed an "independent review" of the approximately 4,000 pages of docuemnts contained within the habeas record in Hurdsman's case in an astounding twelve (12) minutes; and they have done so further in the majority of habeas cases that are filed with the Court and are denied by "post-card" after the Court's independent sham review of the record.

101. It is a fact of life, that the very small number of privileged individuals whom can afford a post-conviction appeal attorney to represent them have their 11.07 applications treated differently than those that do not, and that they are almost always afforded a full and fair fact finding process which almost always include a hearing in the trial court.

102. For everyone else that cannot afford an attorney, because they are minorities and systematically poor, the current post-conviction system in the State of Texas is a complete and utter failure, and violates at least three fundamental principals of fairness the ordinarily guide the judiciary, as follows:

    a.  First, judges should abide by the terms of the constitutions they swore to uphold and the laws as written, but the current system does not do that;

    b.  second, judges should not deligate judicial discretionary decisions to staff members, no matter how talented they feel that they may be, but that is precisely what is occurring in the TCCA, and;

    c.  third, each judge must individually decide each case that results in a final decision so that denial of habeas relief stems from a determination by a quorum of judges.

103.  Collectively, as written, CCP Article 11.07 § 3(b), (c) and (d), contain arbitrary, ambiguous, overbroad, vague, indefinate and uncertain language on its face which invite, permit and allow each different district attorney in the 254 counties in the State, and each different district court judge in the 507 judicial dictricts, to treat 11.07 applicants unequally based on their race, religious or political beliefs, and connections in the communities and with the attorneys and judges of the State.

104.  And the process and procedures, and acts and ommissions of the Defendants, concerning Hurdsman's and other individuals 11.07 applications affend principals of justice so rooted in the traditions of our society as to be ranked as fundamental, and they transgress any recognized principal of fundamental fairness in operation, that they violate subsatntive and procedural due process and equal protections of the law.

105.  As written, CCP Article 11.07 § 3(b), (c) and (d), are so vague, arbitrary, amiguous, overbroad, indefinate and uncertain that men of common intelligence must necessarily guess at their meanings, and that they would each differ as to their application, and to the requirements which must and must not be imposed.

106.  As written, CCP Article 11.07 § 3(b), (c) and (d), and the internal administrative procedures instituted by the TCCA violate the Fifth and Fourteenth Amendments of the United States Constitution, and Article I §§ 3, 3(a) and 19, and Article V § 4 of the Texas State Constitution.

107.  The Writ of Habeas Corpus is the fundamental instrument which safeguards individual freedom against arbitrary and lawless state

action, and the Framers of the Constitution viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the Writ of Habeas Corpus as a vital instrument to secure that freedom.

108.   "[T]he very purpose of the Writ of Habeas Corpus [is] to safeguard a person's freedom from detention in violation of Constitutional guarantees," Blackledge v. Allison, 431 U.S. 63, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977); that is precisely why the Founders implemented in the Constitution limited grounds for its suspension. See U.S. Const. Art. 1, § 9 c1.2.

109.   The Texas Writ of Habeas Corpus statutes codified in Article 11.07 of the CCP clearly provide a liberty interest for individuals such as Hurdsman who have been unlawfully convicted in the State of Texas in violation of the United State Constitution, and its Amendments, and the Texas State Constitution, and its Articles.

110.   In fact, the second sentence of CCP Article 11.07 § 5, states, "[u]pon reviewing the record the Court "shall" enter its judgment remanding the applicant to custody or 'ordering his release,' as the laws and facts may justify;" and Article 11.04, Construction, states, "[e]very provision relating to the Writ of Habeas Corpus "shall" be most favorably construed in order to give effect to the remedy, and protect the rights of the person seeking relief under it."

111.   And the TCCA has repeatedly confirmed the inherent liberty interest within the Great Writ, "[t]he purpose of a Writ of Habeas Corpus is to obtain a speedy and effective adjudication of a person's right to liberation from illegal restraint." Ex Parte Kerr, 64 S.W. 2d 414, 419 (Tex.Crim.App 2002); Ex Parte Ramzy, 424 S.W. 220 (Tex. 1968).

112.  Hurdsman had a protected liberty interest in a fair trial and

to a fair process leading up to that trial; however, although he

was convicted that conviction was invald because he did not recieve

a fair trial, nor did he recieve a fair process leading up to that

invalid trial.

113.  At trial, and leading up to that trial Hurdsman was unconsti-

tutionally denied:

    a.  His Sixth Amendment right to counsel altogether for a
        period of 33-months, after his right to counsel had
        attached, when his innefective counsel withdrew from
        his case without notice or his presence in court;

    b.  his Sixth Amendment right to effective assistance of
        counsel when his attorney abruptly withdrew from his
        case in the middle of plea-bargaining negotiations and
        leaving him without an attorney in the case for 33-months;

    c.  his Sixth Amendment right to a speedy trial in the case,
        as the trial did not commence until 43-month after he was
        arrested in this run-of-the-mill theft case, and he was
        incarcerated almost that entire period.

    d.  his Fifth and Fourteenth Amendment right to a fair trial
        itself when he was forced to wear a restraint without a
        legitimate state interest being involved and after two
        jurors not only seen, but also commented on the restraint
        and why they thought he was wearing it, and;

    e.  his Fourth Amendment right not to be convicted on evidence
        which was unlawfully obtained by law enforcements use of
        unlawful search warrant tainted with illegally obtained
        information.

114.  However, Hurdsman was denied any meaningful and adequate oppo-

rtunity to develop and expand the record with facts relevant and

material to the legality of his confinement, and to present his

claims in the context of the State's post-conviction appellate pro-

cedures pursuant to Article 11.07.

115.  The relevant and material facts in Hurdsman's case to support

the aforesaid claims are not the type that are normally made or part

of the trial record, and need to be further developed through a full and fair fact finding process and procedure.

116. However, Hurdsman was constructively and systematically denied any and all opportunity to be permitted to fully and fairly develop and expand the record to support the aforesaid constitutional claims.

117. The State's CCP Article 11.07 post-conviction procedure was fundamentally inadequate to vindicate the substantive rights that are provided, and to absolve the unconstitutional conviction that Hurdsman recieved and his protected liberty interest attached thereto.

118. The arbitrary, ambiguous, overbroad, vague, indefinate and uncertain language as written, and on its face, of Article 11.07 § 3(b), (c) and (d), and the TCCA's internal administrative procedure which allows a staff member or employee to decide to deny an individuals 11.07 application, and then assign and recommend that disposition to a single judge whom simply rubber-stamps that recommendation, has turned the Texas Writ of Habeas Corpus process into a sham procedure.

119. It in no-way affords individuals an adequate and meaningful procedure to fully and fairly develop and expand the record at the State court level to effectively challenge the legality of a persons unconstitutional conviction; and it is the only procedure available to vindicate that unlawful conviction:

> "After conviction the procedure outlined in this Act shall be exclusive and any other proceeding shall be void and of no force and effect in discharging the prisoner." CCP Art. 11.07 §5 (last sentence).

120. On April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified 28 U.S.C §§ 2241-2255, was signed into law,

which substantially changed the Federal Courts' review of habeas corpus cases.

121.   The AEDPA was drafted by members of the U.S. Congress and enacted with the premise, and faulty presumption, that all state courts would provide habeas applicants will a full and fair process to develop the record in order to support their constitutional claims and, therefore, be given a meaningful opportunity to present their claims through the state's procedure.

122.   As such, § 2254(e)(2) of the AEDPA precludes federal courts from considering any evidence submitted by a federal habeas petitioner if it was not first developed through an evidentiary hearing or by other means at the state court level, and is already part of the record made in the state court.

123.   Thus, a federal Judge is constrained to review the reasonableness of the TCCA's denial of an individuals 11.07 application under § 2254(d), with only reference to the record actually before the TCCA. In otherwords, the record is limited to the one made before the state trial court upon federal review.

124.   However, as shown in Hurdsman's case, and which is done in thousands of cases each year, the arbitrary, ambiguous, overbroad, vague, indefinate and uncertain CCP Article 11.07 statute, and the unlawful TCCA's internal administrative procedures, allow that State and its Judges to arbitrarly, capriciously and discriminatorily deny, by constructive or otherwise means, any full and fair opportunity to develop the record at the state court level to support their claims challenging the legality of their convictions in violation of the United States and Texas State Constitutions.

31.

125.  Texas!  unconstitutional, farcicle and inexplicable Writ of
Habeas Corpus procedures are nothin but one big charade, and makes
it extremely easy for the State, its prosecutors, trial court judges
and TCCA judges to arbitrarily, capriciously and discriminatorily
dispose of any 11.07 applicant's applications that are undesirable
and that they simply do not want to entertain without cause.

126.  By continuing to allow such a sham process and charade to be
perpetrated by the State of Texas, its prosecutors and judges, in
which 11.07 applicants' like Hurdsman are constructively and uncon-
stitutionally denied any opportunity to fully and fairly develop the
record in order to support their claims at the state court level, and
further condoning the TCCA's so called independent review of the
record by only a staff member or employee and a single judge of the
court, 11.07 applicants are punished, the State is rewarded, and the
courts are encouraged to continue such arbitrary, capricious and
discriminatory conduct in the future.

127.  The United States and Texas State Constitutions, and their
Amendments and Articles, and common law principals of fundamental
fairness entitle an individual like Hurdsman and many others who are
unlawfully restrained of their liberty in the State of Texas in
violation of their constitutional rights, One-Fair-Bite of the Apple,
to develop the record to support their claims through a full, fair
and just procedure in order to challenge the legality of their
confinement.

128.  However, the arbitrary, overbroad, ambiguous, vague, undefinate
and uncertain language of Article 11.07 as written, and the TCCA's
internal administrative procedures, allow the State's 254 different

prosecuting attorneys, 507 different district court judged, and the 9 different judges of the TCAA, to not even have to provide a person unlawfully convicted and confined within the State of Texas- the Apple, let alone, the One-fundamentally fair-Bite of the Apple.

129.   "Federal Courts may upset a State's post-conviction relief procedures [] if they are fundamentally inadequate to vindicate the substantive rights provided." District Attorney's Office for Third Judicial District v. Osborne, 557 U.S. 52, 69, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009). The Plaintiffs respectfully request this Court to do so in light of the aforesaid facts within this Complaint.

## VIII. PRAYER

130.   The Plaintiffs' pray that this Honorable Court enter proper orders and judgments granting the Plaintiffs the below requested declaratory relief, and any other equitable relief that this Court finds to be fair and just and in accordance with the Constitutions and laws of the United States and the State of Texas.

## IX. REQUEST FOR RELIEF

131.   The Plaintiffs' re-allege and incorporate by reference para-graphs 1-130 of this Complaint into each of the following requests for relief, as if stated therein.

REQUEST FOR DECLARATORY RELIEF:

132.   Plaintiffs' seek a declaration from this Court pursuant to 28 U.S.C. §§ 2201-2202 against the Defendants, Declaring that:

   a.   The acts and ommissions of former Wise County District Attorney Gregory Lowery, and District Court Judge Brock Smith, concerning their handling of Plaintiff Rodney Hurdsman's CCP 11.07 application, violated his Fifth and Fourteenth Amendments rights to Due Process and Equal

Protections of the Laws pursuant to and under the United States Constitution;

b.  the acts and ommissions of Gregory Lowery and Brock Smith concerning their handling of Plaintiff Rodney Hurdsman's CCP 11.07 application, violated his rights under Article I, §§ 3, 3(a) and 19, to Equal Rights and Equality under the Law and Due Course of the Law, Pursuant to and under Texas State Constitution;

c.  CCP Article 11.07, § 3(b), (c) and (d), are unconstitutional on their face as written, and incorporate arbitrary, vague, ambiguous, overbroad, indefinate and uncertain language that conflict with the mandatory language drafted into the body of the body of the Articles sections and claused, which invites and permits arbitrary, capricious, unequal and discriminatory treatment of different people by state judicial officials based on race, religion, political belief and societal standing in the community;

d.  the acts and ommissions of TCCA Judges Sharon Keller, David Newell, Barbara Hervey, Kevin Yeary, and Bert Richardson, concerning their handling of Plaintiff Rodney Hurdsman's CCP 11.07 application violated his Fifth and Fourteenth Amendment rights to Due Process and Equal Protections of the Laws, under the United States Constitution, and to Equal Right and Equality under the Laws and Due Course of the Laws, under Article I, §§ 3, 3(a) and 19, pursuant to Texas State Constitution, and;

e.  the current standing internal administrative operating procedures promulgated, implemented and used by TCCA judges Sharon Keller, David Newell, Barbara Hervey, Kevin Yeary, and Bert Richardson, and in Plaintiff Rodney Hurdsman's case, which allow a staff member or employee of the Court to make a prefunctory determination and recommendation that an individuals 11.07 application should be denied, and then permits that staff member or employee to assign a case to a single judge of the Court who may then sign-off on the recommendation issuing a post-card denial of an application without written opinion, and based on the findings of the trial Court and/or on an independent review of the Court, without convening and consulting a quorum of TCCA judges, as mandated by Article V, § 4 of the Texas State Constitution, violates that Article, and violates Articles §§ 3, 3(a) and 19, of the Texas State Constitution, and the Fifth and Fourteenth Amendments of the United States Constitution.

133.  The Plaintiffs' further request a judgment pursuant to 28 U.S.C. § 1988 against the Defendants in a monetary amout to be determined by the Court, for any filing fees and attorneys fees and any other costs

associated and incurred by the Plaintiffs in this suit, and for any other equitable relief that this Court finds fair and just and in accordance with the law.

## X. DECLARATION

134.   I, Rodney A. Hurdsman, hereby declare and certify pursuant to 28 U.S.C. § 1746, that I have read the aforesaid Complaint, and the matters alleged therein are true and correct, except those matters alleged on information and belief, and to those matters I believe them to also be true and correct.


Executed, and dated, on this the 21st day of April, 2022.

By: _Rodney A. Hurdsman_
Rodney A. Hurdsman #02170782
TDCJ-CID, Robertson Unit
12071 F.M. 3522
Abilene, Texas   79601


RODNEY A. HURDSMAN
PLAINTIFF PRO SE